1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4    TALEL AWEINEH                  §     CASE NO. 4:23-cv-04422
                                    §     HOUSTON, TX
5    VERSUS                         §     TUESDAY,
                                    §     MAY 14, 2024
6    CLEAR BLUE INSURANCE COMPANY   §     10:11 AM to 10:56 AM

7                            EVIDENTIARY HEARING

8              BEFORE THE HONORABLE GEORGE C. HANKS, JR.
                      UNITED STATES DISTRICT JUDGE
9
                               APPEARANCES:
10

11       FOR THE PARTIES:               SEE NEXT PAGE

12       ELECTRONIC RECORDING OFFICER: AARON JACKSON

13       COURT CLERK:                   KIM PICOTA

14

15

16

17

18

19

20

21                      TRANSCRIPTION SERVICE BY:

22                      Veritext Legal Solutions
                      330 Old Country Road, Suite 300
23                           Mineola, NY 11501
                      Tel: 800-727-6396 ▼ www.veritext.com
24
         Proceedings recorded by electronic sound recording; transcript
25                  produced by transcription service.

```
 1                              APPEARANCES:

 2    FOR THE PLAINTIFF:            DICK LAW FIRM PLLC
                                    Chris Carmona
 3                                  3701 Brookwoods
                                    Houston, TX 77092
 4                                  832-207-2007

 5    FOR THE DEFENDANTS:           WILSON ELSER MOSKOWITZ EDELMAN
                                    & DICKER LLP
 6                                  Jeffrey David Hill
                                    901 Main Street, Suite 4800
 7                                  Dallas, TX 75202
                                    214-698-8000
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; TUESDAY, MAY 14, 2024; 10:11 AM
 2              CLERK:  All rise.  The United States District Court
 3    in now in session.  The Honorable George C. Hanks, Jr., now
 4    presiding.  God save these United States and this Honorable
 5    Court.
 6              THE COURT:  Please be seated everyone.  Good morning,
 7    everyone.  The next case on the Court's docket this morning is
 8    Cause Number 4:23-cv-4422, Aweineh v. Clear Blue Insurance
 9    Company.  Can counsel just introduce themselves to the Court
10    and state the parties they represent starting with the
11    Plaintiff.
12              MR. CARMONA:  Chris Carmona with the Dick Law Firm
13    for the Plaintiff, Talel Aweineh.
14              THE COURT:  Okay, welcome.
15              MR. HILL:  Jeffrey Hill for the Defendant, Your
16    Honor.
17              THE COURT:  Welcome, everyone.  Well, thank you for
18    being here this morning.  I'd called this hearing because you
19    remember at our last hearing that we had by video, the
20    representations were made that in fact there were no documents,
21    I mean, there weren't any documents of subsequent repairs.
22    They'd been looked for, couldn't find them, they didn't exist.
23    And now based on the response, it turns out that there are
24    documents and there have been repairs.  So, counsel for the
25    Defendants if you'd like to talk to me about that.  I mean what
```

1    did you get from the Plaintiffs?

2            MR. HILL:  Your Honor, I've received two sets of

3    documents from the Plaintiff.  I have received an

4    unauthenticated invoice from a Superior Star Real Estate

5    Company, which states that Mr. Aweineh paid half up front, and

6    I believe it says and will pay the remaining upon completion.

7    And that's going to be attached as, I believe, it's Docket 28-

8    2, Your Honor, to Plaintiff's response.

9            I've also received some receipts that appear for a

10   large amount of tile sold to a Muhammad Aweineh, but I'm not

11   sure who that is.  Those are the only things I've received.

12   Now, it is possible, Your Honor, if anything has been sent to

13   me in the last 24 hours, as I let your staff know, I was

14   trapped on a plane for seven hours yesterday.  So, I have not

15   gotten through the 128 pending emails that I have.  So, I do

16   apologize if more information has been sent.

17           But as of today, I have not received updated

18   discovery responses which identify the documents that have been

19   produced in the request for production, updated disclosures

20   identifying any parties.  We still haven't received, you know,

21   a plumbing invoice or event the identity of the plumber was who

22   supposedly fixed whatever the cause of this loss is.

23           I haven't received bank statements that support that

24   these invoices were paid since I've been told they were paid in

25   cash.  That's it, that's all that we have received.  Not really

1    much for me to go on and there's still not enough information

2    for me to even confirm that this has actually been paid beyond

3    just this one document, Your Honor.

4         THE COURT:  One quick question before I turn to the

5    Plaintiffs.  In your policy with Mr. Aweineh isn't, and I want

6    to make sure, isn't -- doesn't it require that Mr. Aweineh

7    comply with any requests from the carrier for information in

8    order to receive coverage?

9         MR. HILL:  Yes, Your Honor.  And that's important for

10   two reasons, and that's why we've highlighted it so heavily in

11   our motion, is number one, if you start repairs and it turns

12   out something may cost more, that's how the carrier finds out,

13   oh, we need to get on this and figure out what if anything else

14   needs to be paid.  The second reason is if it turns out that it

15   costs less than you were paid for by the insurance company, the

16   policy's very clear, once repairs have been completed to the

17   home, you're only responsible for the total amount incurred for

18   the cost.  And that's part of the reason why we raised this

19   issue in a motion is this case is also pending an appraisal,

20   Your Honor.

21        If we can't verify that this was actually paid, you

22   know, just for example, if this is really just his friend and

23   they wrote this estimate and they did all these repairs for

24   like 30,000, or even assuming that all of this tile, which I

25   think my math says is 20,000 square feet of tile, was used to

1    repair the home, that's only like $11,000 from all of this.

2            So, it's very treacherous for the case to go forward

3    when there's a possibility that a final judgment could be

4    rendered that would require the insurance company to pay more

5    than they are legally required to under the contract.  And

6    that's the whole reason why we're here is we're just trying to

7    verify this information so we can do whatever it is that we

8    need to do.  But without that information I don't think that we

9    can go forward in the case, Your Honor, because of the

10   prejudice that it would put Clear Blue Insurance Company in for

11   that potential judgment.

12           More importantly, to all of those document requests

13   and turning things over and why all those letters that we

14   attached as exhibits to our motion were sent, if you don't save

15   this information, showing up two and a half, three years later

16   and saying well, I don't have any of this information, that

17   doesn't cut it.  Unfortunately, we don't live where we can just

18   take somebody at their word that they've done it.  They have

19   the requirement to show that they have paid for this

20   information that's been requested for, that's it's quite

21   frankly a complete waste of judicial resources that we even

22   have to have this hearing.  Because up until two weeks ago, the

23   position was no repairs had even been done to this house.  And

24   now, we've got a repair estimate.  And lo and behold, we've got

25   pictures just from that same week of the hearing that were

 1   attached to our motion that show it has been repaired.

 2          And if you look at the pictures that were submitted

 3   as part of Plaintiff's estimate, the house was repaired before

 4   litigation was even initiated.  And that's part of the

 5   frustration, Your Honor, but that is truly why we're here.

 6   We're just trying to verify the information so that the case

 7   can move forward.  Or maybe we can't, and the case shouldn't

 8   move forward.

 9          THE COURT:  Counsel?

10          MR. CARMONA:  Yes, Your Honor.  I mean, I think that

11   was a disingenuous response to your question, Your Honor, for a

12   couple reasons.  One, at the last hearing, or when we

13   approached this Court, I made it a point to let you know that I

14   had spent hours upon hours searching this file for the

15   communication that Mr. Hill said existed, that an attorney from

16   our firm stated that the repairs had been made, etcetera,

17   etcetera.  Still can't find the communication.  Asked Mr. Hill

18   for that communication; he hasn't provided that.

19          When we -- through the hearing we had the other --

20   the last time, it was a thing.  I said, Your Honor, based on

21   what I've looked at in this file, I have not seen anything of

22   evidence of repairs, any client communication that had been

23   logged, same thing, no evidence of repairs.

24          After the -- your stern warning at the hearing about

25   if we can't produce anything, we'll have to have an evidentiary

1  hearing, call the Plaintiff to the stand, and ask him if the

2  repairs have been made, our office contacted Mr. Aweineh

3  discussed that with him, and he said, well, I could get -- I

4  could get them, I should be able to get them.  He did.

5       THE COURT:  But here's the problem.  Why wasn't this

6  turned over sooner?  I mean, Mr. Aweineh obviously had made

7  repairs, he obviously has the documents.  Why weren't the

8  documents turned over in response to discovery?

9       MR. CARMONA:  Your Honor, I don't have the reason for

10  that, and I can't -- I'm not pretending to have one.  I joined

11  the firm as a managing attorney on April 1st.  Obviously, based

12  on Mr. Hill's communication prior to that this has been going

13  on before April 1st.  But I think you can agree, I've been

14  responsive since I've been involved.

15       But I want to go back to one thing about after we

16  submitted the invoice.  Now, we're moving the goal posts.  We

17  submitted the invoice, we said, yeah, okay, there was some

18  miscommunication between our office and the client, we admit

19  that.  There have been repairs, here are the invoices, and here

20  are the -- this is the main contractor who did everything.

21  This contractor did everything for the house.  And attached

22  were also the invoices for the materials to use for that.  Then

23  the goal posts move.  Okay, well now I need to see a bank

24  account that shows it was -- the money was actually withdrawn.

25       THE COURT:  I'd want to have a lot more information

1    than that because basically, okay, --

2            MR. CARMONA:  Well, hold up --

3            THE COURT:  -- it's not moving the goal posts.

4    Basically, you or somebody represented that there were no

5    repairs.  I mean, I was on the phone call, you said I've looked

6    through the file, there are no repairs.

7            MR. CARMONA:  No, Your Honor, what I said was, I've

8    looked through the file for hours looking for this

9    correspondence from --

10           THE COURT:  But it doesn't make any difference

11   whether there's correspondence, you had discovery.  I've seen

12   discovery.  It says turn over the documents.  That -- those

13   documents were never turned over.  It doesn't matter whether

14   you had -- I assumed, let's assume that there was never

15   correspondence.  I believe you.  But let's assume there was

16   never correspondence.  You had discovery that said that you

17   needed to turn this information over, and you should have

18   turned it over.  I mean, you should have turned it over, Mr. --

19           MR. CARMONA:  Your Honor, and I can respect -- the

20   reason why it was so imperative for me to know who sent that

21   communication is so I can communicate with that person, track

22   them down.  And if they're still at the firm, discuss them with

23   them.  If they had left the firm, still locate them, and try to

24   understand this.

25           THE COURT:  No, the first thing to do is call Mr.

1    Aweineh and ask him have you turned over documents --

2             MR. CARMONA:  And we did that, Your Honor.

3             THE COURT:  -- or made any repairs.  And when he's --

4    and what did he, I mean, I can't ask you that, that's attorney-

5    client privilege.  But if he said yes, then you'd say okay

6    where are the documents so I can make sure to get them over to

7    the Defendants?  If he said no, then you've got your answer.

8             MR. CARMONA:  Understood.  And that's what we did,

9    Your Honor, and that's why we were able to send that over to

10   Mr. Hill immediately upon receipt.

11            THE COURT:  So, what matter -- so, it doesn't make

12   any difference what communications were made.  The bottom line

13   is -- okay, let me -- let's do this way.

14            Mr. Aweineh, please stand up and raise your right

15   hand.  Do you solemnly swear that the testimony you're about to

16   give in the case before this Court will be the truth, the whole

17   truth, and nothing but the truth so help you God?

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Can you please -- you can place your hand

20   down.  Can you please state your name for the record?

21            THE WITNESS:  My name is Talel Aweineh.

22            THE COURT:  Okay.  And Mr. Aweineh, in this matter

23   did you provide your counsel with information regarding repairs

24   that had been made to your property?

25            THE WITNESS:  Your Honor, when I was asked, and that

```
 1    was recently, I submitted whatever I have.

 2             THE COURT:  Were you never asked beforehand, before

 3    recently --

 4             THE WITNESS:  No, sir.

 5             THE COURT:  -- to provide that information?

 6             THE WITNESS:  No, sir.

 7             THE COURT:  Okay.

 8             THE WITNESS:  No, sir.

 9             THE COURT:  And when you say recently when -- can you

10    give me a time frame when you were asked?

11             THE WITNESS:  I want to say maybe two months ago.

12             THE COURT:  And when you were asked for that

13    information did you provide it to someone?

14             THE WITNESS:  I provided it to my attorney.

15             THE COURT:  And which attorney was that?  Is it the

16    attorney standing next to you?

17             THE WITNESS:  No, sir.  It's to the office.

18             THE COURT:  Do you remember who at the office you

19    provided it to?  I mean, trying to find out.

20             THE WITNESS:  Manji, what's his name?

21             MR. CARMONA:  Can I help him with the name, Your

22    Honor?

23             THE COURT:  Oh, sure.

24             MR. CARMONA:  Manji.

25             THE WITNESS:  Now Your Honor, may I say something?
```

```
 1                THE COURT:  Yes, sir.

 2                THE WITNESS:  At the time when I asked for some

 3    repairs or not and all that, I told him I didn't have

 4    everything that I needed to submit for you guys.  But if

 5    there's any possible way from the insurance company to send

 6    their adjuster to my house to inspect that everything was done

 7    in the house and the repairs were complete, I would appreciate

 8    it very much.  That would help a lot.

 9                So, I believe the insurance company did send an

10    adjuster and another adjuster also from Dick Law Firm, which my

11    attorney office, they came to the house, and they inspected

12    everything in the house that it was repaired.

13                THE COURT:  Okay.  Let me stop you real quickly.  So,

14    they inspected the repairs that had been made?

15                THE WITNESS:  Yes, sir, they did.  May I say

16    something else?  At the time, that was three years ago when the

17    incident, they told me if there's any furniture that was

18    damaged.  I said yes.  They told me to send the list.  I sent

19    the list with pictures for each and every item that got damaged

20    from the water to insurance --

21                THE COURT:  Okay.  Who did you send that --

22                THE WITNESS:  The insurance --

23                THE COURT:  Who did you send that to?

24                THE WITNESS:  To the insurance company.

25                THE COURT:  Okay.
```

```
 1              THE WITNESS:  The insurance company out of $40,000
 2   something worth of furniture, they sent me a check for $1,700.
 3   I told them, why don't you send an adjuster to check on the
 4   furniture that got damaged?  They never did.  That's why I have
 5   to go and find an attorney to cover at least some of my loss
 6   from the money that they never paid me.
 7              THE COURT:  Well, I understand that.  No question.  I
 8   understand why you had to bring a lawsuit.  But what I was
 9   trying to figure out is where this information was regarding
10   the repairs.  This --
11              THE WITNESS:  I wasn't asked for it earlier before.
12   There was some kind of miscommunication between me and the
13   office of paperwork.
14              THE COURT:  So, you were never asked for this
15   information before like two months ago?
16              THE WITNESS:  No, sir.
17              THE COURT:  Thank you, sir.  Do you have any
18   questions of the witness?
19              MR. CARMONA:  Not for purposes of this hearing, Your
20   Honor.
21              THE COURT:  Great, thank you.  So, this is what I
22   wanted to figure out.  Now, counsel, my next question is Mr.
23   Aweineh says that he turned it over two months ago.  Where did
24   it go?  Where did the information go that's responsive to the
25   requests?  The requests are older than two months ago.  But --
```

1           MR. CARMONA:  Your Honor, I know two weeks ago right

2    after we got off the hearing, we made the attempt to contact

3    Mr. Aweineh.  Two months ago, I can look in the CLEO file to

4    see what -- of any communication, but I have nothing to show

5    that two months ago any documents were provided.  There may

6    have been communications asking for it, but I don't have

7    anything in the file or in CLEO that says documents were

8    tendered two months ago.  The first time that we got this --

9    these documents that we submitted were I believe the 2nd of --

10   we tried getting to Mr. Hill before filing his motion, but as

11   soon as we got them, we scanned them and emailed them over

12   within all of five or 10 minutes.

13           THE COURT:  Counsel, do you have anything that you

14   want to add?

15           MR. HILL:  Your Honor, I just want to point out that

16   the documents, the main one that we received, is from 2022.

17   It's now 2024.  And more importantly, as part of the mission

18   that we're here for today, in Interrogatory 24 when we asked

19   each contractor, and for the record this is Document 27-8, at

20   the bottom of the page, Interrogatory 24.  "Identify each

21   contractor company that performed repairs to your home or

22   contents as a result of this claim."  There's no objection in

23   the responses.  "Plaintiff is presently experiencing financial

24   limitations preventing them from carrying out essential repairs

25   due to insufficient funds resulting from Defendant's failure to

1    release the owed claim coverage.  As a result, Plaintiff is

2    anticipating a resolution from the insurance company, which is

3    crucial for them to proceed with the necessary repairs.

4    However, the Plaintiff took prompt measures like covering the

5    holes, cracks, tears with plastic sheeting or waterproof tarps

6    to temporarily shield water intrusion, conducted an interior

7    ceiling inspection, and tried to cover any seepage to mitigate

8    the damage and prevent further damage to the property."

9                THE COURT:  Can you give the date of that response?

10               MR. HILL:  The certificate of service located on Page

11   4 of Document 27-8 states March 8th, 2024.  And it -- I can go

12   through the requests for productions, Your Honor, that are

13   unobjected, but I -- unless you want me to, I think I'll --

14   there's nothing further for me to add.

15               THE COURT:  No problem.  I mean, the problem is these

16   repairs, the receipts that you have, at least what I've seen,

17   is these repairs were done back in 2022.

18               MR. HILL:  Yes, Your Honor.  So, and that's -- to

19   keep this brief for the hearing, there's multiple issues.

20   Number one, we didn't get a chance in time to go and

21   investigate to see what was actually done to the property and

22   have our general contractor go in and ensure that each and

23   every item on these estimates was actually part of the damaged

24   property.

25               The second problem is there is a pleading that is

1   based off a $137,000 estimate that was presented to the

2   insurance company for payment which the pictures in that

3   estimate, which I have a photograph in the motion, show that

4   the property was already repaired at the time that that

5   estimate was written and submitted.

6          And now, we're finding out that the now, the true

7   cost is 90,000 or approximately half because we don't have the

8   other part of this invoice or any proof that it was actually

9   paid.  So, I'm looking at this and already just seeing the

10  amount of time, effort, and litigation costs that are going to

11  have to go into try and unwind this and go backwards.

12         And this is why this stuff has to be given to the

13  insurance company at the time.  This is why when simple

14  discovery responses are given, telling us that we don't have

15  anything and because it doesn't exist is not appropriate.

16  Giving us two or three documents and telling them that's enough

17  for you to defend your case is also not an appropriate response

18  to it, in our opinion, Your Honor.

19         And once again, that's why we proceeded with our

20  motion instead of withdrawing it because these documents are

21  not sufficient.  We asked for the ACH transactions, we asked

22  for withdrawals, anything to support it.  I've followed up.

23  And once again if there's been follow up, I'll apologize I've

24  not gotten through all of my emails.

25         But this is information that should be basic.  This

1    is stuff that we should be entitled to to defend this case or

2    even determine if a case needs to go forward.  And that's the

3    whole reason why we have to file this motion.  And it's a

4    motion we shouldn't have to file, Your Honor.

5         THE COURT:  Respond?

6         MR. CARMONA:  Yes, Your Honor.  To say that there has

7    never been an opportunity to inspect the damages, it's just not

8    true, it is not supported by the claim filed.  They've done

9    multiple inspections and adjustments at the time of the claim,

10   throughout the claim, after the repairs, and again recently as

11   a couple weeks ago.

12        THE COURT:  But here's the problem.  You've got

13   discovery from 2024 saying that there's no repairs.

14        MR. CARMONA:  No --

15        THE COURT:  So, even if they had gone out there and

16   looked at it if you're representing that there's no repairs

17   then that's a lie.

18        MR. CARMONA:  Your Honor, I can address that shortly.

19   But we have to address the blatant incorrect information that

20   was just spouted out.  That information is just as false as

21   saying that no repairs have been made.  To sit there and say

22   there was never a chance to inspect the damage, that's as false

23   as saying there was no repairs made, and we can't overlook

24   that.  And then the second --

25        THE COURT:  One second.  One second.  Before we go

1    on, I just want to look at something.  I'll be right back.

2    Hold that thought, sir, I just want to take a look at

3    something.  I'll be right back.  I don't have the access to the

4    attachments on my iPad.  I'll be right back.

5                    (Recess)

6                    CLERK:  All rise.

7                    THE COURT:  So, I have what I needed to see.  I need

8    both counsel to answer these questions, and it's very clear.

9    One, the interrogatory responses clearly state under oath that

10   no repairs have been made.  Isn't that a true statement?  Mr.

11   Hill?

12                   MR. HILL:  That is my interpretation, Your Honor.

13                   THE COURT:  I don't think it's interpretation, it

14   says that.

15                   MR. HILL:  Yes, sir.

16                   THE COURT:  And Mr. Carmona, doesn't the

17   interrogatory responses say that no repairs have been made?

18                   MR. CARMONA:  I believe that's what it says, Your

19   Honor.

20                   THE COURT:  Okay.  And you've got the claims file.

21   You've got their claims file.

22                   MR. CARMONA:  There was a claim filed, yes, Your

23   Honor.

24                   THE COURT:  And do you have it?

25                   MR. CARMONA:  Not on me, but yes, we do have it.

```
1              THE COURT:  Okay.  Where in the claims file does it
2    say, and that's what I'm looking for, that the insurance
3    company was ever notified that repairs were being started on
4    the property?
5              MR. HILL:  It does not, Your Honor.
6              THE COURT:  Do you have any evidence that the claims
7    file shows that the insurance company was notified that repairs
8    had been started on the property?
9              MR. CARMONA:  We can tender that in a supplemental
10   brief post hearing, Your Honor.
11             THE COURT:  Okay.  Second question.  In the claims
12   file -- or in the claims file is there any evidence of the
13   insurance company ever saw the repair -- saw the repairs, have
14   seen the repairs?
15             MR. HILL:  Yes, Your Honor.
16             THE COURT:  And when was that?
17             MR. HILL:  That would have been approximately, I
18   believe a week after the date that's listed in Exhibit E, where
19   we had learned the property had been repaired and Keystone
20   Engineers went out to the property to try and figure out how
21   much it cost to repair it.  They did not have the estimates, so
22   they wrote their own and paid based off just guessing because
23   they weren't notified that repairs had been started.  But it is
24   in the claim file and the insurance company was aware that it
25   had been done.
```

```
 1              THE COURT:  But the key is, were you ever -- I mean,
 2   and that's what I assume the question is, when was the
 3   insurance company ever notified the repairs had been started?
 4   Because the whole point is you need to see -- you need to know
 5   that there's repairs so that you can go out and figure out what
 6   damage is from the busted pipe and what damage wasn't so that
 7   you can figure out whether or not you should be paying for it.
 8              MR. CARMONA:  And they did that inspection when they
 9   adjusted the claim amount.
10              THE COURT:  Mr. Hill?
11              MR. HILL:  I'm not sure I understand the response so
12   --
13              MR. CARMONA:  When the claim is made, they send their
14   adjuster out.  They're supposed to -- the insurance company,
15   Clear Blue, they send out their adjuster.  They analyze the
16   damage.  They say this is the pipe, this is the roof, this is
17   the walls, the ceiling, they adjust the claim.  They have not -
18   - when they do that, they are doing their inspection.
19              So, they have seen the damage when Mr. Aweineh makes
20   the claim.  That is part of the process.  That's why they make
21   an offer okay we've (indiscernible) and we've looked at your
22   property, we looked at the plan, we think it's worth this
23   amount.  And then they start going into the discussions back
24   and forth for the next few years.  But they have made an
25   initial inspection of the damage at the time of the claim.  So,
```

1    for them to say that it's never happened is disingenuous and

2    just not accurate.

3              THE COURT:  Well, no, he didn't say that.  But the --

4    I mean, you've seen it.  The question is, were you told about

5    it before the repairs were made?

6              MR. HILL:  When you say it, do you mean --

7              THE COURT:  I mean, were you told, were you informed

8    by the Plaintiffs when the repairs were started?

9              MR. CARMONA:  That's not required by the policy, Your

10   Honor.

11             THE COURT:  But the problem is in the interrogatory

12   responses you say that no repairs have been made.  So, if

13   you're saying that no repairs have been made, you're trying to

14   say that they had to go behind your sworn statements and figure

15   out the repairs had been made?

16             MR. CARMONA:  No, Your Honor.  I think that's the

17   reason of the motion in the first place.  They're saying these

18   interrogatories can't be right, we've seen it, it has been

19   repaired.  So, but again, your concern -- what I understand is

20   did they have an opportunity to see it prior to repairs and

21   after repairs.

22             THE COURT:  Yes.

23             MR. CARMONA:  And they have.

24             THE COURT:  But that's not the problem.  The problem

25   is --

```
 1            MR. CARMONA:  And there's nothing in the policy that

 2    requires them to be notified when the repairs start and every

 3    step through the process.  If anything, the policy encourages

 4    them to hurry up and get the thing --

 5            THE COURT:  No, no.

 6            MR. CARMONA:  Because they want to get the RCB.

 7            THE COURT:  No, no, that's not how this works.

 8    Respectfully, you need to let them know when the repairs are

 9    made so that they can figure out whether or not those repairs

10    should be paid for or not paid for.  I mean, that's --

11            MR. CARMONA:  After the fact, correct, Your Honor,

12    you are.  But what I'm saying pre claim habits, pre damage

13    repairs, there's a time period in there.  The policy states for

14    them to receive the maximum amount the RCV, the (indiscernible)

15    cash value, not the ACV, they have to do the rebuild, they have

16    to make the repairs.  Otherwise, they never get the RCV.

17            So, it's encouraged in the policy for them to, in

18    order to receive the maximum amount on the claim to get the

19    repairs done as soon as possible.

20            THE COURT:  Without notification to --

21            MR. CARMONA:  There's nothing in the policy that

22    requires them to be notified.  Now, after the damage has been

23    made, they're going to ask about it, they're going to send out

24    an inspector.  And they do that, and they did that.  So,

25    there's nothing in the policy that requires them to notify I'm
```

1    going to do the floors today, I'm going to do the wall today,

2    I'm going to do the sink today.  Nothing in the policy requires

3    that.

4         So, we're adding an extra requirement that's not

5    there and is not bound by the contract.  They had an

6    opportunity to inspect before, they had -- they know what it

7    looked like after the fact.  When we're talking about -- when

8    it comes to the invoice the key word is incurred.

9         Mr. Hill is -- the bottom line, well, he didn't --

10   well, we don't know if he paid all of it, we don't know if he

11   paid a little bit of it.  The word is incurred.  That is a key

12   operative word.  It doesn't matter what the bill is or what

13   he's paid on the bill, if he's incurred those expenses, he's

14   incurred those expenses.  He subpoenaed the company.  If he

15   wants to ask the company, you know, was this the legitimate

16   rate, you know, that's his prerogative.  Anything else goes to

17   veracity of the testimony at a trial.

18        But to say that it's not admissible or that it's --

19   we don't know if it's real because we don't know if he paid it

20   all in cash and how often we paid.  The word is incurred.

21        THE COURT:  But when did you get that information?  I

22   mean, you --

23        MR. CARMONA:  I got this May 2nd, Your Honor.  And

24   Your Honor if I can kind of help shortcut --

25        THE COURT:  I'll let you argue.  What I'm hung up on

1  is there's a sworn interrogatory saying no repairs have been

2  made and that was relied upon not to turn over documents.  It

3  wasn't until you filed your motion to compel that all the

4  sudden the story changes well, yeah, there really were -- there

5  were repairs made, and we do have documents and now I'm going

6  to give them to you.

7           MR. CARMONA:  It was -- which we tried giving those

8  before a motion was made.  It was in response to our

9  discussion, our conference, our status conference we had.  So,

10  it wasn't he made the motion and then we gave them to him.  It

11  was after we had the conference.  Me being new to the case and

12  having a fresh set of eyes and wanting to do what's right for

13  our clients and the firm going forward making sure that the

14  carriers have everything they need to make these cases go as

15  quickly and smoothly as possible, I made sure that we had a

16  client who was responsive and turned over the documents

17  immediately.

18           So, again, we tried getting this to Mr. Hill before

19  he filed his motion.  He wasn't satisfied with what we gave him

20  because he wanted to know how he paid for it.  But again, it's

21  incurred not paid is the operative word.  And he still filed

22  the motion anyway, Your Honor.

23           THE COURT:  Well, I'd file it too because I was --

24  you lied to him.  You told him in your interrogatories that

25  there were no repairs being made, no repairs had been made, and

1   then you relied on that to say that there no documents to turn

2   over.  I mean, that's the truth.  You told him there are no

3   repairs being made; we have no record of these repairs being

4   made.

5              MR. CARMONA:  Yeah.

6              THE COURT:  And therefore, we have no documents to

7   turn over to Mr. Hill.  Mr. Hill files his motion, and then

8   it's like well, yeah, it turns out you're right there were

9   repairs made, we do have documents, we'll give them to you now.

10  I mean, you didn't tell him the truth and you did it under

11  oath.  You told him that there were no documents and there were

12  documents.

13             MR. CARMONA:  Your Honor, I stand by that statement.

14  At the file, our file had no documents in there.  So, to sit

15  there and say that I was lying is actually --

16             THE COURT:  But -- but you --

17             MR. CARMONA:  -- it's kind of really offensive, Your

18  Honor.

19             THE COURT:  Well, no, no, no.  You provided

20  interrogatory responses saying that no repairs had been made.

21             MR. CARMONA:  Your Honor, can you say the firm

22  because when you say me, it makes it seem like I am --

23             THE COURT:  Oh, well, somebody -- who signed the

24  interrogatories?

25             MR. HILL:  Mr. Dick.

1          THE COURT:  Well, Mr. Dick on behalf of Mr. Aweineh

2     responded that there were -- that no repairs had been made and

3     that's not true.  In any world --

4          MR. CARMONA:  It is (indiscernible), but I just --

5          THE COURT:  Okay.

6          MR. CARMONA:  And I think Mr. Hill could agree I

7     haven't lied to him.

8          THE COURT:  Okay.  No, I'm not saying you.  I'm

9     saying the attorney in charge.  Whoever the attorney is that

10    signed those pleadings said there were no repairs.  There were

11    repairs done, that's the problem.  And I didn't mean to imply

12    that you did it, it's clear whoever signed those

13    interrogatories did not tell the truth because there were

14    repairs made.

15         And what bothers me about this is that they relied on

16    those interrogatory responses not to turn over documents.  I

17    mean, because in the argument was, we don't have any documents

18    to turn over because there's been no repairs made.  Well, it

19    turns out there were repairs made and there were documents.

20         And Mr. Dick, respectfully, didn't tell the truth

21    when he said that there were no repairs made.  And in response

22    to the discovery -- can you read me the response to the request

23    to production on those -- on the repair documents?

24         MR. HILL:  Your Honor, for the record that's Document

25    27-8.  Request for Production Number 8, "Release any documents"

1    -- oh, wait.  Hold on.  Sorry, Your Honor, that's 27-8, Page

2    11.  "Produce any and all estimate, invoices including proof of

3    repairs related to the claim including but not limited

4    photographs, copies of canceled checks, credit card statements,

5    ACH, and bank statements to support cash withdrawals."  No

6    objection.  Answer.  "After diligent search, the Plaintiff was

7    able to find documents responsive to the request including

8    contents estimates and property damage estimates.  Please see

9    the production link.  If anything else is found responsive,

10   we'll supplement it."  There's no Bates number, so I have no

11   idea which documents this response refers to.

12          However, I feel 99 percent positive they're referring

13   to their estimate from their expert for $137,000 for the

14   property and then a contents spreadsheet and a couple other

15   documents with it.

16          THE COURT:  And Mr. Carmona, I didn't to imply that

17   you had done it, somebody represented the interrogatories, and

18   it's Mr. Dick.  He represented in those interrogatories that

19   there's no repairs.  Obviously, there were repairs, the

20   document should have been turned over.  At this point and time,

21   whatever information that you -- Mr. Hill wants he gets

22   regarding the repairs.

23          MR. CARMONA:  And Your Honor, we're -- and we -- Your

24   Honor, we understand that and we're agreeable to his request

25   for -- to stay in the appraisal process for 45 days and for us

1   to give him full production of whatever items and if not

2   submitted within 60 days (indiscernible) confirm that

3   everything's been complied with, we understand this Court can

4   move forward in dismissing our claims.  We're fine with that

5   request.

6           THE COURT:  All right.  You're going to -- so, you're

7   going to turn over everything he wants?

8           MR. CARMONA:  As long as -- I mean, if it exists,

9   Your Honor.  We're not hiding anything.  Whatever exists --

10  again, I'm not -- I'm not Mr. Dick, right?  I'm Chris Carmona,

11  I'm an upstanding member of the State Bar of Texas, have been

12  for the last 14 years.  I have never been sanctioned, never

13  been called into question.

14          THE COURT:  And I'm not claiming the same to you.

15  It's not --

16          MR. CARMONA:  No, I'm not saying I've never been --

17          THE COURT:  This isn't your fault.

18          MR. CARMONA:  I say that because I'm a man of my word

19  and my clients can attest, and most opposing counsel can attest

20  for the most part that when I say something's going to get done

21  it gets done.  Just as I told him I said I'm going to get to

22  the bottom of this.  If there's been repairs, I'm going to --

23  we're going to find out.  And I did that quickly.  So, whatever

24  he's asking for in discovery we'll get that over in 45 days,

25  Your Honor.

```
 1              THE COURT:  Mr. Hill.

 2              MR. HILL:  I would like to say I hope I believe him,

 3   but from listening to the comments it sounds like they don't

 4   think they have to turn over bank statements.  That they don't

 5   because it's incurred not actually paid.  I mean, I'm for

 6   whatever the Court proposes.  It's just that, and this is once

 7   again absolutely not directed to Mr. Carmona.  After a long --

 8   the last year of dealing with the Dick Law Firm we have to do

 9   this on almost every single case.

10              THE COURT:  And I've got six of these where we've

11   done this.

12              MR. HILL:  Yes.  Yes.  And it's --

13              THE COURT:  And it's not your fault, Mr. Carmona.

14   I've done this dance before in other cases.

15              MR. CARMONA:  Your Honor, there's a reason why I was

16   brought in.

17              MR. HILL:  Yes, and that's why I wanted to make very

18   clear that this is not directed towards the new lawyer on this

19   in any way whatsoever.  However --

20              THE COURT:  And I personally in this Court we've had

21   to do this dance multiple times where the same thing happens.

22   We've got requests that say there are no documents, we go

23   through the dance, and it turns out there are documents.  And

24   then we move on down the road.  I'm tired up it, respectfully.

25   The -- whatever information that you want regarding these
```

1  repairs you need to get so that you can confirm in fact the

2  repairs been made, all the information so that you can evaluate

3  the case and figure out what needs to be done.

4           So, what I want you guys to do is sit down, Mr.

5  Carmona, and give -- I mean, I know you're a man of your word,

6  I'm not -- this isn't your fault, I'm not blaming you in any

7  way.  But this is just the reality of what this Court has had

8  to deal with in almost all these cases.

9           MR. CARMONA:  And I understand that, Your Honor.  I

10  get that.

11           THE COURT:  So, you know, you walk, talk to Mr. Hill.

12  Mr. Hill, you're dealing with Mr. Carmona now not Mr. Dick.

13  Work with him, see if he can get you what you need and then you

14  guys can move on.  And Mr. Carmona seems to be a man of his

15  word, and I take him at his word, he's been straight with the

16  Court in every representation he's made.  You didn't know.  So,

17  why don't you try to work with him and try to get this done?

18  And whatever information you need, Mr. Carmona, you get it to

19  him.  And if there's a problem with that come back to me and

20  let's talk about it.

21           MR. CARMONA:  And that's for any case.  I mean, you

22  know, I've -- Mr. Dick is doing marketing.  I've taken over

23  litigation and all aspects of it.  So, anything, any case just

24  come to me, please.  And we'll get for all the cases, not just

25  this one -- and we'll get it taken care of.  And I hope that

1    helps ease the load of not just this Court, but all courts that

2    we have business in.

3              THE COURT:  Thank you, Mr. Carmona.

4              MR. CARMONA:  I've had a tough task, Your Honor.  But

5    you know, changes are being made, have been made, and it

6    doesn't happen overnight because there's a pipeline of things

7    that are still.  But I think most opposing counsel see things

8    going forward have been in a different light.  So.

9              THE COURT:  And I -- and you're in good standing with

10   the Court, Mr. Carmona, don't worry about that.  When I said

11   that about lying, it was the attorney who signed the documents.

12             MR. CARMONA:  Thank you, Your Honor.

13             THE COURT:  Not the current counsel in front of me.

14             MR. CARMONA:  Right, because that's why I was like,

15   wait, wait, wait, you're yelling at me you lied on that.

16             THE COURT:  No, no, no.  I didn't mean it that way.

17             MR. CARMONA:  Thank you, Your Honor.

18             THE COURT:  I meant that the attorney who is the

19   attorney of record at the time that those documents were

20   signed.  I mean, respectfully, there's no other way to see it.

21   It says that there's no repairs made, there were repairs made.

22   It was signed under oath that no repairs had been made and they

23   had been made.  The attorney made a misrepresentation to the

24   Court and the opposing counsel.  No question about that.

25             MR. CARMONA:  Understood, Your Honor.

```
1          THE COURT:  I mean, respectfully, that's what the

2     documents show.  You've always been truthful with the Court.

3     You said you didn't find it in the file, you didn't find it.

4     Wherever it was, you know, you got the information after the

5     Court asked for it.  You've got the information now, so that's

6     done.

7          But what the Court wants to point out and you need to

8     let Mr. Dick know is that he should be very, very careful in

9     his representations in interrogatories and requests for

10    production because not only opposing counsel relies on it, but

11    the Court relies on it.  If it says that no repairs have been

12    made, he should have been doing good faith and good faith

13    investigations to confirm whether or not repairs had been made

14    before he signed those interrogatories.

15         MR. CARMONA:  Understood, Your Honor.

16         THE COURT:  Just like you did.  I mean, you did

17    exactly what should have been done, which is look in the file,

18    you couldn't find the file, call the client, the client will

19    give you the information, and you can get that information to

20    Mr. Hill.  You know, he shouldn't have just represented that

21    nothing had been done without doing what you did.

22         So, Mr. Hill, I think you've got what you need.  I

23    mean, you will get what you need.  If there's a problem, let me

24    know.  Mr. Carmona, thank you for stepping in and trying to get

25    these cases under control and moving forward.
```

1          MR. CARMONA:  It's long days, Your Honor, long days.

2          THE COURT:  I understand.

3          MR. CARMONA:  But I know what I signed up for and the

4     clients and the whole system is deserves an improvement so.

5     And we're well aware of that.  So.

6          THE COURT:  Is there anything further?  Mr. Hill, if

7     there's a problem, let me know.

8          MR. HILL:  Will the Court put out an order for

9     today's rulings?  I'm not exactly sure what they were today.

10         THE COURT:  Well, basically, today's rulings the

11    information responsive to the discovery requests need to be

12    produced by -- today's Tuesday -- by next Tuesday at the

13    latest.  I'll put that in the order.  All the information; it's

14    not objected to, and it should be produced.  And you talk to

15    him about what that information is.  I mean, basically, what

16    I'm thinking is we need the information to verify in order to

17    process the claim.

18         MR. HILL:  Yes, Your Honor.  The carrier actually

19    paid this without even getting any proof of the plumbing

20    repairs, which was kind of them still waiting on it.  So,

21    that's, you know, a critical thing.

22         THE COURT:  Work with Mr. Carmona and see if you can

23    get all documents responsive to the discovery requests.

24         MR. HILL:  All right.  Thank you, Your Honor.

25         MR. CARMONA:  Thank you, Your Honor.

1              THE COURT:  You all may be excused.  Thank you again

2     and thank Mr. Carmona, I appreciate it, sir.

3              MR. CARMONA:  Thank you, Your Honor.

4          (Hearing adjourned at 10:55 A.M.)

5                              *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                              RULINGS

4                                              Page        Line

5     Responsive documents to be produced by      33          10

6     May 21, 2024

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  November 27, 2024